

## AFFIDAVIT IN SUPPORT OF A
## CRIMINAL COMPLAINT AND ARREST WARRANT

I, Laura J. Goshen, a Special Agent with the Federal Bureau of Investigation (the "FBI"), being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. This Affidavit is made in support of a criminal complaint and arrest warrant for **GREGORY RAY BLOSSER ("BLOSSER")** for violations of Title 18 U.S. Code § 1343 (wire fraud).

2. I am a Special Agent with the FBI, and have been since on or about August 24, 2014. I am an "investigative or law enforcement officer" of the United States, within the meaning of Section 2510(7) of Title 18, United States Code. That is, I am an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

3. I have attended the training course for Special Agents at Quantico, Virginia. I am currently assigned to the Baltimore Field Office, Annapolis Resident Agency, where I investigate a variety of criminal violations, including violent crimes and complex financial crimes. I have been trained in the requirements for probable cause. I also have training and experience in the enforcement of laws of the United States, including training in the preparation and execution of search warrants. I have been the affiant on email, cellular phone, and physical location search warrants, as well as assisted in the preparation and/or execution of numerous search and arrest warrants.

4. This affidavit is made in support of a criminal complaint charging **BLOSSER** with knowingly and willfully executing and attempting to execute a scheme and artifice to defraud and deceive clients of The Surrogacy Group and to obtain money from those clients by

means of false pretenses, representations, and promises by transmitting or causing to transmit by means of wire communications in interstate and foreign commerce **an international wire transfer, on or about May 31, 2017, from Victim #2's Australian bank account in the amount of $35,000 to a BB&T bank account in the United States in the name of The Surrogacy Group and controlled by BLOSSER ending in 8434, in violation of 18 U.S.C. § 1343.**[1] This wire transfer is described in more detail paragraph 15 of this affidavit.

5. Each and every fact known to me concerning this investigation are not included herein. Only the facts and information set forth are believed to be necessary to establish probable cause that certain federal violations have occurred.

## SUMMARY OF PROBABLE CAUSE

**Introduction**

6. The Surrogacy Group, LLC, (TSG) is a Maryland company that was incorporated on January 5, 2012 and operated by **BLOSSER** at 126 Cathedral Street, Annapolis, MD 21401. As of March 5, 2019, TSG's website (www.thesurrogacygroup.com) lists the address of 100

---

[1] The full text of 18 U.S.C. § 1343 is as follows:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

2

Ashley Drive South, Suite 1720, Tampa, FL 33602 as an additional TSG office location. In October 2015, TSG's corporate charter was forfeited for failure to file a property return in 2014. However, as described below, **BLOSSER** and TSG continues to offer and sells surrogacy-related services to consumers in the name of TSG by phone, email, and through the Internet. The investigation to date has revealed that **BLOSSER** solicits and accepts funds from individuals who desire to have children using a surrogate promising to use those funds to support the surrogate during a pregnancy and then fails do so.

### The Scheme to Defraud

#### a. Victim #1 (Maryland)

7. In March 2018, the FBI received a complaint from Victim #1 (V1), who resided in Maryland, indicating that he/she had been defrauded by **BLOSSER** and TSG. Following the initial complaint, your affiant interviewed V1 in April 2018. According to V1, V1 enlisted the help of **BLOSSER** and TSG to locate a surrogate to carry a child for V1. V1 desired to have a child, but was unable to carry a child herself due to medical reasons. V1 indicated that **BLOSSER** explained TSG was designed to assist intended parents, such as V1, with navigating through the surrogacy process from locating a surrogate through the child's delivery. In July 2016, V1 paid BLOSSER a $14,500 "locating fee" to find a suitable surrogate for her and her husband. V1 paid the fee in two credit card installments, the first being $7,000 and the second $7,500. However, according to V1, several of the individuals **BLOSSER** proposed as surrogates were not suitable candidates. Ultimately V1's medical doctor was able to locate a surrogate for V1 from **BLOSSER**'s database of candidates.

8. After a surrogate was chosen for V1, V1 and the surrogate signed a contract known as the "gestational contract," which detailed the terms and roles of each party throughout

3

the surrogacy process. V1 advised that **BLOSSER** required V1 to open an escrow account to be controlled by himself as the escrow agent in order to pay fees to the surrogate for expenses in accordance with the gestational contract. In or around June 13, 2017, V1's husband wrote a check to TSG in the amount of $25,000 from his Bank of America account to be deposited into the escrow account to cover all of the expenses. Bank records obtained by your affiant revealed that the check was deposited into a TSG account at BB&T bank ending in 8434 on or around June 23, 2017.

9. Sometime after signing the gestational contract, V1's surrogate informed V1 that **BLOSSER** had not made any payments from the escrow account. V1's surrogate was entitled to approximately $3,000 per month according to the gestational contract, as well as payments for medical expenses. V1 and V1's surrogate contacted **BLOSSER** to inquire why the payments had not been made. On March 11, 2018, V1 sent an email to greg@surrogacygroup.com account that requested **BLOSSER** pay a laboratory bill for V1's surrogate. V1 informed **BLOSSER** in the email "i will hold you accountable for all late charges and any risk that occurs due to your irresponsible if she is not able to get her labs done. This is unacceptable behavior on your part." Following this email, V1 and V1's surrogate received an email from greg@surrogacygroup.com on March 12, 2018 that stated "I had to pick up my daughter from school at 11 & to her doctor for another flipping ear infection. I am now getting caught up on things."

10. Eventually V1's surrogate received a payment in March 2018 of $3,250, but no additional payments were made to V1's surrogate despite numerous demands from V1. As a result of the issues with **BLOSSER**, V1 terminated her agreement with **BLOSSER** on or around March 29, 2018, and demanded return of the funds in the escrow account. However, **BLOSSER** has not responded to V1's demands and has not made any attempt to repay V1 any funds. Per

the terms of the gestational agreement between V1 and the surrogate, V1 is responsible for compensating the surrogate for the birth of the child and all additional fees that she has is owed even if V1 is unable to recover the funds from **BLOSSER**.

### b. Victims #2 and #3 (Australia)

11. In June 2018, your affiant interviewed Victim #2 (V2) and Victim #3 (V3), both of whom reside in Australia. V2 and V3 located **BLOSSER** and TSG online and contacted **BLOSSER** in or around March/April 2015. Following the initial contact, V2 and V3 signed a contract with **BLOSSER** and TSG in or around March 2016. The contract outlined the services to be provided by TSG, which included matching the couple with a surrogate. On or around April 4, 2016, V2 initiated an international wire transfer from V2's Australian bank account in the amount of $14,500 and wired the funds to a TSG BB&T bank account ending in 8277 in Greensboro, NC.

12. V2 and V3 traveled to TSG's office in Annapolis, Maryland, in June 2016 and met with a TSG employee. However, V2 and V3 never met **BLOSSER** in person. According to V2 and V3, **BLOSSER** informed the couple that he only handled "complicated" clients. When V2 and V3 demanded to see **BLOSSER** in person, the TSG employee provided excuses for why **BLOSSER** was unable to meet and re-assured V2 and V3 that the process was going smoothly. **BLOSSER** only communicated with V2 and V3 through phone calls, email, text messages, and What's app.

13. In or around May 2017, **BLOSSER** located the first potential surrogate for V2 and V3 and orchestrated a phone call between the couple and the potential surrogate. However, the fertility clinic used by V2 and V3 denied the surrogate based upon her medical background.

Subsequently, another potential surrogate was located for V2 and V3. V2 and V3 selected this surrogate. According to V2 and V3, after locating the surrogate, **BLOSSER** suggested V2 and V3 complete a gestational contract between themselves and their selected surrogate and provided the couple with a template of the contract. V2 and V3 completed the gestational contract with the surrogate in December 2017.

14. On May 30, 2017, V2 received an email from greg@surrogacygroup.com. The email stated that the surrogate's base fee was $35,000 and the fee needed to be deposited into an escrow account. The email also contained funding instructions for the escrow account. The email also contained the salutation "Thanks Greg" with a photograph. Based on your affiant's review of **BLOSSER's** Florida driver's license photograph, your affiant believes the person depicted in the photograph is **BLOSSER**.

15. **After receiving the email, V2 and V3 wired BLOSSER approximately $35,000 to a TSG BB&T bank account controlled by BLOSSER ending in 8434, in Greensboro, North Carolina, on or around May 31, 2017, to set up the escrow account for the surrogate.** V2 and V3 indicated that they asked **BLOSSER** for a receipt after sending the funds, but **BLOSSER** never responded. However, the same TSG employee that V2 and V3 had met at TSG's Annapolis, Maryland office informed V2 and V3 that the money was received. Financial records indicated this payment was deposited into a TSG bank account at BB&T bank ending in 8434.

16. Similar to V1, V2 and V3 began to experience problems with **BLOSSER** in obtaining payments due to the surrogate. On March 15, 2018, an attorney for V2 and V3's surrogate sent an email to greg@surrogacygroup.com that stated "If everything is straightened out, can we please have confirmation that the amounts previously set out have been/or will be

paid to Amy immediately? When I last spoke to her she still had not received anything but the $500 transfer fee." On March 16, 2018, the surrogate's attorney received an email from greg@surrogacygroup.com. The email stated "Hi! That was paid & invasive was sent. I am waiting on pay stubs To verify time off," referring, your affiant believes, to time off that the surrogate had to take in order to undergo an embryo transfer procedure. The email contained the salutation "Thanks Greg" with a photograph. Based on your affiant's review of **BLOSSER'S** Florida driver's license photograph, your affiant believes the person depicted in the photograph is **BLOSSER**. In response to the email, the surrogate's attorney sent an email to greg@surrogacygroup.com on March 16, 2018, that stated no pay stubs were required for reimbursement per the terms of the gestational contract. However, **BLOSSER** never provided the surrogate with the payment for travel expenses when she traveled to Maryland for the embryo transfer procedure.

17. According to V2 and V3, **BLOSSER** did provide the surrogate with one payment of $500 for an embryo transfer procedure, but never paid the surrogate any of the additional funds due to her. These payments included expenses related to medical testing and invasive procedures, as well as a $3,500 monthly allowance due to be paid to the surrogate every month after the baby's heartbeat was confirmed. The surrogate was also entitled to an additional $250 per month for miscellaneous expenses, which was also not paid by **BLOSSER**.

18. V2 and V3's attorney attempted to contact **BLOSSER** to request the funds in the escrow account be returned in order to have the funds transferred to a new account controlled by another company, but **BLOSSER** never transferred the funds. According to V2 and V3, **BLOSSER** maintains approximately $34,500 of V2 and V3's funds in the escrow account that was never returned.

7

### c. Victim #4 (North Carolina)

19. In July 2018, your affiant interviewed Victim #4 (V4), who resides in North Carolina. V4 began to interview surrogacy agencies in 2017 after V4's spouse learned she could no longer carry children on her own. V4 located **BLOSSER** through a "friend of a friend" who worked with **BLOSSER** as a counselor in 2013 or 2014.

20. V4 reached out to **BLOSSER** in or around July of 2017. V4 felt that **BLOSSER** was very understanding and compassionate and liked the way in which **BLOSSER**'s contract was structured. Specifically, V4 liked that **BLOSSER**'s contract stated that the initial fee of $14,000 was returnable if the process didn't result in a positive outcome. Other agencies V4 researched did not have a guaranteed refund.

21. V4 and his spouse began the process of in-vitro fertilization (IVF) at a fertility clinic in Charlotte, North Carolina, prior to looking for a surrogate. V4 decided to begin IVF first on the advice of **BLOSSER** because according to V4, **BLOSSER** indicated he would be able to find a surrogate quickly.

22. V4 and his spouse successfully harvested one embryo through IVF in September 2017. In October 2017, V4 signed a contract with **BLOSSER** and sent **BLOSSER** $22,000. According to V4, $14,000 of the $22,000 provided was **BLOSSER**'s fee and the remaining funds were meant to cover attorney fees, the screening of potential surrogates, and locating a surrogate. On October 27, 2017, V4 received an email from greg@surrogacygroup.com that

8

contained a receipt for the $22,000 payment and stated "Please see the attached receipt. Thanks Greg."

23.  According to V4, **BLOSSER** did not send potential surrogate candidates expeditiously as planned following receipt of the funds. **BLOSSER** was in communication with V4, but it was not consistent. On April 25, 2018, V4's spouse emailed **BLOSSER** and stated that she and V4 had attempted to reach **BLOSSER** for several days. On April 25, 2018, V4 and V4's spouse received a response from greg@surrogacygroup.com that stated "Hi!! You texted me? So strange. I haven't received anything from you. I have a couple of candidates in mind for you. I will be sending you profiles shortly. :-) Thanks Greg." According to V4, **BLOSSER** did send V4 approximately six or seven surrogate profiles between February and April 2018, but none of the surrogates were suitable candidates.

24.  At the end of April or beginning of May 2018, V4 asked **BLOSSER** to refund his money. According to V4, **BLOSSER** informed V4 over the phone that he would return his money and that he had started the refund process. On or around July 16, 2018, V4 and V4's spouse received an email from accounting@surrogacygroup.com that indicated V4's refund request was being processed and could take up to 30 days. The email also stated that **BLOSSER** would need to approve the refund. The email contained the salutation "Kindy, Sara" and a signature block that read "Accounting Team The Surrogacy Group, LLC (443) 569-3070." V4 attempted to call the number provided in the email minutes after the email was received, but nobody answered. V4 called again and left multiple messages and called what V4 believed was the company's main line, but did not receive a response.

9

25. On August 15, 2018, V4 received an email from greg@surrogacygroup.com. The email stated that TSG clients are refunded in the manner in which they paid and since V4 paid with a credit card, V4 would be refunded on his credit card. The email also stated that if TSG refunded the credit card, the credit would not be processed until the end of the month and TSG would lose fees that the company had paid to charge V4's credit card. Further, the email stated that V4 would receive a refund quicker if V4 disputed the charge with the credit card company. On August 17, 2018, V4 and V4's spouse received an email from greg@surrogacygroup.com that stated "I am having trouble understanding why you feel that you are entitled to a full refund." The email also stated "I will speak with Attorney Roberts about his & let you know how to proceed." On August 29, 2018, V4 sent an email to greg@surrogacygroup.com and gregblosser1@gmail.com that stated V4's credit card company would not process the dispute given that the date of the transaction was 10 months prior. V4 also stated that he/she expected the credit card refund to be initiated in a normal manner and would look for confirmation of the processed return.

26. Following V4's initial demand, V4 continued to attempt to contact **BLOSSER** on numerous occasions to secure a refund. On September 12, 2018, V4 and V4's spouse received an email from greg@surrogacygroup.com that stated "We are prepared to refund you. The problem with the refund is that we have performed work on your behalf. I need to follow up with John today to see what we can work out." Following this email, V4 received email correspondence from an individual who identified himself as "Brian" and reported to be an associate of **BLOSSER**'s who was assisting **BLOSSER** while he was out for a medical condition. V4 communicated with "Brian" through email to attempt to reclaim his funds. However, V4 has never received a refund from **BLOSSER** or TSG.

### d. Victims #5 and 6 (Virginia)

27. In September, 2018, your affiant interviewed Victim #5 (V5) and Victim #6 (V6), who reside in Virgina. V5 and V6 desired to have a child, but V5 was unable to carry a child and decided to considered surrogacy. The Columbia Fertility Center (CFC) provided V5 and V6 with information regarding multiple surrogacy options and agencies, one of which was TSG. V5 and V6 contacted TSG in December 2016. Initially, V5 and V6 did not hear back from anyone at TSG. However, V5 and V6 eventually made contact with **BLOSSER** in January 2017.

28. On January 26, 2017, V6 received an email from gregblosser1@gmail.com. The email stated that TSG had an Agency fee of $14,500, which was due at the time of signing an agreement with TSG and covered services provided by the company up until after the child's delivery. Further, the email stated that TSG offered a "guarantee program" for a price of $22,000 that included legal fees, TSG's Agency fee, fees related to psychological screening, and a trust account. The email also stated that in this payment option, TSG offered a 75% money-back guarantee in the event of an unsuccessful pregnancy. The email contained the salutation "Thanks Greg" with a photograph. Based on your affiant's review of **BLOSSER'S** Florida driver's license photograph, your affiant believes the person depicted in the photograph is **BLOSSER**.

29. In April 2017, a total of three embryos were harvested from V5 and V6's genetic material. At this time, V5 and V6 re-contacted TSG to begin the process of locating a potential surrogate. On April 5, 2017, V6 received email from gregblosser1@gmail.com that contained a TSG client representation and fee agreement, a list of expected fees and due dates, and a credit card authorization form. The email contained the salutation "Thanks Greg" with a photograph.

11

Based on your affiant's review of **BLOSSER'S** Florida driver's license photograph, your affiant believes the person depicted in the photograph is **BLOSSER**. Subsequently, V6 wired $22,000 on or around June 14, 2017, to TSG's BB&T bank account ending in 8434. According to V5 and V6, **BLOSSER** delayed sending profiles of potential surrogates after receiving the funds, and did not send many profiles. Between April 2017 and November 2017, V5 and V6 received approximately four potential surrogate profiles from **BLOSSER**, but the candidates were not viable.

30. In November 2017, V5 and V6 participated in a conference call with a potential surrogate from Richmond, VA. The couple liked the potential surrogate right away. V5 and V6 also spoke with the potential surrogate's husband to ensure he was supportive and onboard with the process. According to V5 and V6, **BLOSSER** informed the couple that the potential surrogate signed a contract with TSG that stated she would return funds paid to her out of escrow if she backed out of the agreement. However, the potential surrogate informed V5 and V6 that she never signed any contract with **BLOSSER** or TSG.

31. V5 and V6 felt **BLOSSER** pushed the couple to set up an escrow account prior to a contract being signed with a surrogate. In December 2017, V5 and V6 set up the escrow account. On December 29, 2017, V6 and wired $20,000.00 into a TSG account at Suntrust Bank ending in 5949 for the escrow account to be controlled by **BLOSSER**. On January 8, 2018, V5 and V6 wired an additional $10,000 to a TSG account at Suntrust Bank ending in 5949 also for the purpose of being deposited into an escrow account.

32. According to V5 and V6, **BLOSSER** advised the couple that everything was moving forward, but V5 and V6 learned from CFC that the surrogacy process would take longer

12

than **BLOSSER** indicated. A nurse at CFC informed the couple that counseling for the surrogate and various tests could cause the surrogacy process to take longer than **BLOSSER** suggested. V5 and V6 indicated that **BLOSSER** stated that the staff at CFC didn't know anything and that several steps of the surrogacy process could be waived so that the couple could be on track to have an embryo transplanted in December 2017. However, V5 and V6 recalled that **BLOSSER** later admitted that the couple would not have a baby in 2018.

33.	V5 and V6 signed a gestational contract with the surrogate in March 2018. The surrogate also participated in counseling in March 2018, which was paid out of pocket by V5 and V6.

34.	According to V5 and V6, **BLOSSER** failed to pay money owed to V5 and V6's surrogate, the surrogate's counselor, and multiple attorneys involved with the surrogacy process. V5 and V6 were forced to pay the surrogate's attorney out of pocket in or around April 2017. Further, V5 and V6 indicated that **BLOSSER** never provided the couple with a copy of the escrow statement despite numerous requests.

35.	V5 and V6 sent **BLOSSER** an email requesting the termination of their contract with TSG and the return of funds on April 19, 2018. Following this email, V6 received an email from greg@surrogacygroup.com on April 20, 2018, that stated "This is not going to happen overnight. I told you this & I am working on it and I want to get this taken care of as much as you do. There are many items to figure out & I have to wait until I hear from my advisory board & the release for you to sign." The email also stated "I will keep you posted & send you the paperwork when I can." Following this exchange, V5 and V6 stated that they contacted **BLOSSER** numerous times in an effort to obtain a refund of the funds, including attempting to

call or email **BLOSSER** approximately three times per day. According to V5 and V6, **BLOSSER** went weeks without responding and when **BLOSSER** did respond, he advised the matter was out of his hands and his legal team was responsible for controlling the release of funds. V5 and V6 stated that **BLOSSER** never returned any money to the couple. In total, V5 and V6 stated that the surrogate had only been paid $700.00 by **BLOSSER** for the mock cycle and screening fees.

    e. **Victim #7 (Germany)**

36. On November 4, 2018, your Affiant received an email from Victim #7 (V7), who resides in Germany. In the email, V7 provided your Affiant with a summary of interaction he/she had with **BLOSSER** and TSG. According to V7, V7 contacted **BLOSSER** in December 2016. On January 17, 2017, V7 received an email from gregblosser1@gmail.com. This email was almost identical to the email sent to V6 on January 26, 2017. The email stated that TSG had an Agency fee of $14,500, which was due at the time of signing an agreement with TSG and covered services provided by the company up until after the child's delivery. The email also stated that TSG offered a "guarantee program" for a price of $22,000 that included legal fees, TSG's Agency fee, fees related to psychological screening, and a trust account. Further, the email stated that in this payment option, TSG offered a 75% money-back guarantee in the event of an unsuccessful pregnancy. Subsequently, V7 signed a TSG client representation and fee agreement with **BLOSSER** on or around January 29, 2017. After signing the agreement, V7 wired a payment of $22,000 from V7's bank account in Germany to TSG's BB&T bank account ending in 8285 in Bowie, Maryland, on or around February 6, 2017.

37. Following the initial payment of $22,000, V7 indicated that TSG introduced V7 to a potential surrogate, whom V7 and his/her wife selected to be their surrogate. V7 and his/her wife started the first IVF cycle in June 2017. Around this same time frame, V7 traveled to TSG's Annapolis, Maryland, office and met with **BLOSSER** and the surrogate. V7 received an email from gregblosser1@gmail.com on or about June 27, 2017 that provided V7 with an address of TSG listed as 126 Cathedral Street, Annapolis, Maryland, 21401 to accommodate the visit. The email contained the salutation "Thanks Greg."

38. On or about October 24, 2017, V7 received an email from gregblosser1@gmail.com. The email stated that V7's surrogate had been cleared to begin the surrogacy process, as well as stated that a copy of an escrow agreement was attached for V7's review. The email also stated that TSG had new wire information to receive payments and contained the salutation "Big Hugs! Greg." V7 replied to the email and requested he/she be provided with the new wire instruction. V7 received a response from gregblosser1@gmail.com on or about October 25, 2017, that contained bank account information and wire instructions for a company known as "The Donor Group, LLC, 126 Cathedral Street, Annapolis, MD 21401". When V7 responded to this email and questioned why the payee had changed from TSG to "The Donor Group, LLC," V7 received an email response that stated "So sorry. I am also The Donor Group. I copied & pasted the wrong details." The email also indicated that the correct information would be sent and contained the salutation "Thanks Greg."

39. On November 28, 2017, V7 received an email from greg@surrogacygroup.com. The email stated that V7's case was on hold until TSG received the signed escrow agreement and the deposit had been made. The email contained the salutation "Thanks Greg." Further, on December 3, 2017, V7 received an email from gregblosser1@gmail.com. The email stated "We

cannot proceed until we receive the signed agreement back & funds sent to us." The email contained the salutation "Thanks so much Greg." Subsequently, on or about December 5, 2017, V7, V7's spouse, and **BLOSSER** signed the escrow contract. V7 then wired a payment of $25,000 from V7's bank account in Germany to TSG's Suntrust Bank account ending in 5949 in Tampa, FL, on or about December 7, 2017, to fund the escrow account. Also in December 2017, V7 and his/her wife traveled to the United States for another cycle of IVF and requested that **BLOSSER** meet the couple in person. However, according to V7, **BLOSSER** was suddenly no longer available and appeared to disappear. Further, all other phone numbers associated with TSG were un-reachable.

40. V7 attempted to reach **BLOSSER** on multiple occasions between January 2018 and April 2018 with little response from **BLOSSER**. V7 sent an email to greg@surrogacygroup.com on March 3, 2018, requesting a meeting with **BLOSSER** when V7 and his/her spouse planned to travel to Annapolis, Maryland, in or around March 21, 2018. However, V7 was unable to reach **BLOSSER** and **BLOSSER**'s office in Annapolis, Maryland, was locked when V7 arrived. V7 also indicated he traveled to TSG's office in New York at another point in time, but the building receptionist indicated she had been at the location for 15 years and was unaware of TSG. Further, V7 indicated that he requested **BLOSSER** provide him/her with access to the escrow portal so that he could confirm the account balance, but **BLOSSER** never did so.

41. On October 10, 2018, an email from support@surrogacygroup.com was sent to V7. The sender of the email identified herself as "Lisa" and stated that she was the Director of Client Services at TSG and would be the couple's point of contact. In the email, "Lisa" also stated that **BLOSSER** had been out of the office on medical leave. V7 continued to

16

communicate with "Lisa" through email following this initial exchange. On October 31, 2018, V7 sent an email to greg@surrogacygroup.com that contained a letter from V7 requesting the return of the V7's escrow funds. V7 explained in the letter that he/she had learned that escrow funds must be held by an independent escrow agent according to Delaware state law. V7 also mailed a copy of the letter to TSG's office at 100 S. Ashley Street, Suite 600, Tampa, FL 33602, but the letter was returned as undeliverable. According to V7, despite this demand, **BLOSSER** has not returned any funds to V7.

42. As of March 2019, TSG's website (www.thesurrogacygroup.com) stated "You may reach Greg via email greg@surrogacygroup.com or (410) 266-7704". Thus, it stands to reason that **BLOSSER** is continuing to facilitate the fraud scheme and attract new victims. Further, your affiant is aware of additional victims that have not been described in this affidavit.

## CONCLUSION

43. Based on the foregoing, I respectfully submit that there is probable cause to believe that **BLOSSER** knowingly and willfully executed and attempted to execute a scheme and artifice to defraud and deceive TSG clients and to obtain money from those clients by means of false pretenses, representations, and promises by transmitting or causing to transmit by means of wire communications in interstate and foreign commerce **an international wire transfer, on or about May 31, 2017, from Victim #2's Australian bank account in the amount of $35,000 to a BB&T bank account in the United States in the name of The Surrogacy Group and controlled by BLOSSER ending in 8434, in violation of 18 U.S.C. § 1343 (wire fraud).**

44. I therefore respectfully request that this Court issue a criminal complaint and a warrant to arrest **BLOSSER.**

## REQUEST FOR SEALING

45.     Because this investigation is continuing, disclosure of this affidavit, and/or this application and the attachments thereto will jeopardize the progress of the investigation. Accordingly, the undersigned requests that the Court issue an order that the criminal complaint and this affidavit be filed under seal until further order of this Court.

Respectfully submitted,

*Laura J. Goshen*
Laura J. Goshen
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
On: **4-29-19**

THE HONORABLE BETH P. GESNER
UNITED STATES MAGISTRATE JUDGE